Thank you, and may it please the Court, I am David Shilton, representing the Secretary of Interior and the National Park Service in particular. And first I'd like to say that Park Service appreciates greatly the fact that the Court has put this on an expedited schedule and has set this special hearing. The primary question raised in this case is whether the revised comprehensive management plan for the Merced River complies with this Court's directive in its 2003 opinion that a revised plan would need to contain actual limits rather than mere examples of possible limits to fully comply with the statutory mandate to quote, address user capacities. This Court made clear that the approach embodied in the Visitor Experience and Resource Protection Framework, or VRP, could be an acceptable method for complying with the statutory requirement if it contains specific indicators and standards. The Court specifically noted in that opinion that the Park Service could address user capacities quote, by monitoring and maintaining environmental and experiential criteria under the VRP framework and quote, that's at 348 Fed Third 796. The problem was that the 2000 comprehensive management plan established no specific indicators or standards to implement the VRP process. It just provided examples, and the Court said that was insufficient. So, in the revised plan promulgated after extensive public process, the Park Service established specific indicators and standards to implement VRP, and they provide current quantitative measures of the effect of users on the resources in the Merced River. The new indicators and standards are effective immediately, and the Park has also adopted interim limits on things like parking spaces, campsites, lodging units, tour buses, and those work together with VRP and with existing capacity limits on activities like wilderness stays and voting and that sort of thing. But didn't we also make clear that even though VRP could be a possible method that there had to be specific standards in place that would, under the statute, protect and enhance the OBRs, the ORVs, in advance of their degradation, and it seems to me when I read through these various VRP scenarios, and the one that you've adopted, that what you're still proposing is to wait and see approach, okay, let's just see what degradation occurs, and then we'll decide what limits to put on the activities and uses of the Park. Well, it is more than a wait-and-see approach, Your Honor. The plan makes clear that if the standards are violated, or if they're getting close to a violation, what the Park Service refers to as a yellow light condition, that the Park Service will act, and that is what... Did you model this on the Department of Homeland Security? No. I think the yellow light, red light is just, you know, the stoplights you see on the street has no relation to Homeland Security. It's just, you know, it's a warning level that we need to take a close look at it. But it allows for something to be done, but it doesn't require anything to be done. Well, the plan says that the Park Service will act if there is a violation of standard. What it doesn't do is say that in a particular situation, the Park Service must take Action A to address this particular violation. It provides a toolbox of management actions that can be taken, that can be drawn from, but doesn't require one of those to be set out in advance, and that's simply because it's really impossible to say at the outset that if standard A is a problem in place B at a particular time of year, that we will do X. You need more flexibility than that. But the Park Service... Why couldn't you say, alright, we're going to test the toxicity of the water in the river, and if the toxicity of the river reaches a certain level, or is above a certain level, then the park manager would be required to take specific steps to make sure that it goes down. The problem with that is that you don't know what may be causing the problem. The problem, if it's fecal coliform, could be due to just the first storm of the year, and it's a lot of wildlife waste being washed into the river. Or it could be a human-caused problem, in which case you would want to take a management action to address that. So there's just so many different possible problems or types of activities that could be causing this that it's not efficient to tie yourself down in the beginning to a particular management measure. But the Park Service does take action. For instance, the parking indicator, which is capacity being reached at the main parking lot. If it's being reached, they call out to the El Capitan Cut-Off station and start diverting cars to other areas so they don't come into the valley. So they do take action, but our point is that the Wildlife and Scenic Rivers Act doesn't require a comprehensive management plan to, in the plan itself, set out exactly what managers will do in particular situations. It allows a more flexible system that has a variety of tools to deal with a variety of situations. I think the district court condemned VRB for being reactive, but I think, as this court said in its Yosemite One opinion, it is possible to rely on the maintenance of environmental and experiential conditions as your limit. And that's exactly what the standards and indicators do. But what you're doing in this plan is using as your baseline what was in existence at the time of the 2000 plan, which we held invalid. So how does that comply with your obligation that VRB to protect and enhance the river? Well, I mean, this court held that the standards and indicators were insufficient as just samples, but I don't think the court did not strike down, for instance, the management zoning aspect of the 2000 plan. No, we did a very reasoned decision. And I think that it's great that you went on to set boundaries for the river and eliminate that problem. But I'm just struggling with why you've persisted, your clients persisted with the VRB when certainly science by now has so many better scientific indicators that could help you meet your statutory obligation to protect and enhance in advance of the degradation that occurred as of 2000. Well, a couple of things. I think actually VRB in this plan is quite a cutting-edge tool. And it doesn't allow degradation. I think a distinction has to be made between a change in an environmental criteria and degradation. You know, when Congress designated Yosemite as a wild and scenic river in 1987, it was well aware that there were parking lots, that there were lodges, and that this was, in many respects, not a pristine area. So there are some impacts from having parking lots and lodges, but that's not the same as degradation. The Wild and Scenic Rivers Act contemplates that you can have recreational zones, and a large part of Yosemite Valley is a recreational zone, and you can have things like parking lots and lodges in that type of zone, even though it's not as ecologically pure as a meadow or a wetland, it's still not degradation. So the fact that if, for these indicators like counting people on a trail, one of the standards for the trail to Yosemite Valley is whether there's more than 20 people on a 50 meter length of trail at any one time. Well, if you go over that standard, that's not degradation of the ORB. But is the recreational use of the river even part of what is supposed to be protected under the statute? Yes, it is, and the Park Service protects that recreation by limiting the amount of boating and so forth, but Congress was aware that the river was being used for boating in the valley, and the Park Service has preserved limits on that to protect it. So, I would stress, of course, that the majority of the Merced River is in wilderness. It's only about 30 miles of the 81 total that's in the valley and other developed areas, but Congress was aware that in those areas you would be able to have facilities, campgrounds and lodges and so forth, and that would be appropriate. So, I don't think there's any degradation, and the Park Service did a careful look at whether the ORBs were being degraded, and in the EIS found that they were not, that under current usage, the ORBs are being protected. And so, for that reason, I think it was appropriate for the Park Service to set interim limits, which are hard limits on things like the number of lodge rooms and the number of parking spaces based on the current situation, which I would point out is quite a bit below what the situation was in 1987 when the river was designated. There are a lot fewer camping spaces, there are fewer lodge rooms, and far fewer parking spaces than there were then. So, keeping that same number is not degradation. The Park Service has found that it can manage that number and still protect the resource quite well. You're now referring to the 2000 CMP that found that? No, this is the current supplemental EIS. I would refer to the excerpts of record at pages 569 to 574, assesses the effects of what the Park Service called Alternative 2, which is the preferred alternative, on the ORVs and finds in all respects that currently the ORVs are being protected and that there's no degradation. I see I'm running a little short of time. I'd like to save some for rebuttal, if I might. Thank you, Your Honor. Good morning, Your Honors. I'm Julia Olson, appearing on behalf of the Plaintiffs' Appellees, Friends of Yosemite Valley, and Mariposans for the Environment and Responsible Government. And with me at counsel's table is Sharon Duggan. Thank you for setting this special time for this hearing. I appreciate it. There are four key things wrong with this plan. Number one, it fails to yield any actual specific numeric limit on use, as this Court and the Wild and Scenic Rivers Act require. If you were drawing up a decree in this case for the district judge, what would you put in to the, what would be your limits for, say, trailhead caps and so forth? How would you design those? You had a perfect, clean slate to write on. Your Honor, unfortunately I'm not a scientist, and so I... I don't know much about trails in wilderness areas, and I know some of them have caps and have so many units you can take in, and so forth. What do you want? The old Freudian question. What do you want? Well, what we'd like the Court to do is to affirm the district court's decision, obviously, and make it clear that the Park Service needs to have a maximum number of people that the river corridor system can accommodate at any given time. And there are different ways the Park could do that, and I think if you look at other land agency, land management agencies and what they have done, there are a lot of examples out there. For instance... Well, we look at them all the time. We get cases here on winter kill caused by snowmobiles, and we see caps on entry trailheads, and we see these all the time in various wilderness areas, and park, particularly national park cases. We're aware of how they do it, but under the Chevron deference rule, doesn't the agency have quite a bit of discretion in how they accomplish the preservation goal? They do have discretion in what kind of maximum number of people they come up with and how that's implemented. But this Court said that the agency must deal with or discuss the maximum number of people that can be received in the river corridor in its prior order, and that's what the agency has failed to do. And whether that's a limit on the number of people at a given time, or whether it's a limit on the number of cars they allow into the river corridor, there are different mechanisms they could use. I think in the end, your position that the agency has failed adequately to deal with these issues is that the reason for the failure is that they haven't picked a number, right? You can have, say, X number of campers or X number of cars or X number. Isn't that what you want? You want a specific number? We do. There needs to be a numeric limit, and the reason for that is all the scientific literature, including the evidence. How do you deal with Mr. Chilton's argument that, well, what is that called? The burp or whatever it's called has all these warning signs so that when it gets close to what they consider capacity, it will send out, send up a yellow flag and then they'll serve as a device to limit further users. What's wrong with that approach? What's wrong with that approach is that VRP doesn't have any kind of protective net mechanism, and we don't disagree that VRP could someday be a great monitoring program to alert the park to degradation that might be happening, but their duty under the Act is to set a protective limit so that degradation won't occur, hopefully, in the first place. And then through monitoring, if they want to use adaptive management, which is what VRP is, to take further action to try to enhance the resource, that would be a good tool for using it for enhancement purposes. But for providing a basic level of protection, they have to have limits because the evidence demonstrates that increasing visitation is directly correlated with increasing degradation. And it's time that this river finally has a protective mechanism. Well, how do you deal with your cousin council's argument that many of the interim limits that they're willing to abide by I guess for five years are actually below user levels before the river was even designated as a wild and scenic river? I disagree with his characterization. I think the facilities limits that they are using as their interim limits, number one, the facilities limits don't stop people from coming into the park. Those people may not find a parking space or they may not have a lodge to stay at, but it doesn't stop people from coming into the park. And further, the facilities limits are based on status quo. They allow for some increases, in fact, and they don't confine the footprint of development in the park. So the Park Service can still go and build new roads or... Well, don't they have trailhead limits now? They do in wilderness areas, and we applaud them for their wilderness trailhead quota system because it actually deals with the increasing visitation and requires people to reserve permits in advance, and they allot some permits I think are available for first come, first serve. So there are all these mechanisms available where people can plan in advance and assure that they'll have an opportunity to visit the river corridor on a particular day. But it gives people advance notice so that they know this is how much use is available, and we'll plan our trip to the river corridor. And what it does, in essence, is it allows a better visitor experience for everybody because right now there's severe overcrowding in the river corridor, especially on the busiest summer days. And there's degradation of resources. So people, when they go to the park, there's construction, there's degradation. They're not having the kind of Merced River Yosemite experience that they're entitled to. One of the amicus briefs argues strongly against caps on the total number of visitors to the park. Is that what you're actually arguing for, or are you saying that you can look at various places in the park, like certain trails or certain, I don't know, commercial areas, and put caps on those limits, and put caps on the number of people there? I mean, you can do something that's more specific to each. I mean, how big is this park? There must be ways, if they put some limits, as I understand, at least two of the limits predate the Comprehensive Management Plan, but if they put it for specific places in the wilderness areas in compliance with the Wilderness Act, could they do some different sort of limitations that would comply with the WSRA? They could have different numeric limits for different areas within the river corridor. One thing that's important, I think, for the court to understand is 70% of people who go to Yosemite go to the river corridor. So, the park is much larger than the river corridor, but people go to the river corridor. And so, system-wide, they need to have some limits, and they may then be able to have limits in specific areas where people go, and they can control it through vehicles entering the river corridor at a given time. They can control it through the number of people who are in the river corridor going to certain areas. They can have a reservation system where people say where they want to go. And the other thing I really want to emphasize is this concept of recreation. Recreation is an ORV, and it's an important ORV. But what the Park Service has done mistakenly is to call all activity and all forms of recreation in the park an outstandingly remarkable value. And that's not true, because their ORV is identified in the plan as based on hiking or swimming. It's nature-based recreation. Yet, the Park Service offers swimming pools and ice skating rinks and sports bars, all these other facilities, lots of gift shops, things that aren't necessary to support the recreation that is appropriate in the corridor. So there are all these services and facilities that accompany all of that use. And if they were able to look at the facilities and services that they provide and say, what do we really need here to accommodate the recreation that's appropriate in this corridor, and then determine what they need to cut back on, what's appropriate, what's not. And the secretarial guidelines, in fact, say that they should provide appropriate facilities that will reduce the impact of use, like restrooms. Are you saying that they should go back to the beginning and start this process all over again and have some alternatives that are not verb-based and take new evidence and open it up for public comment and do an entirely new plan? Yes, absolutely, they need to do that. And one of the key reasons, one of our arguments and claims in this case is that they failed to do a comprehensive plan. And the big problem with that is that they have only in this plan looked at indicators and standards, basically. That's the only difference. You now have 10 indicators and standards. Everything else is the same as it was in 2000, frankly. And so they haven't addressed this issue of types and amounts of use together. User capacity includes types of use and amounts of use. You're referring to the secretarial guidelines, the kinds and amounts. And they're not, they failed to address that. They're not integrating those two things to say, if we allow this type of use, how much of it is appropriate. And those two things are linked because if they were able to look at, okay, maybe we don't need all of these facilities. We need these facilities. Then we could authorize this amount of use. I mean, they're inseparable. They can't say we're going to allow this kind of use without looking at how much of that kind of use is appropriate and protective of the ORVs of this river. I went to say, why is this so important? I think this river is the heart of Yosemite and Yosemite is the crown jewel of the National Park System. And for 20 years now, it's been designated a Wild Scenic River. And it doesn't have a protective management plan. And it's time that the National Park System make a plan that it needs one. If we send them back to the drawing board, and I understand that Judge Ishii put a deadline of September 9, aren't we going to, if we send them back to the drawing board, isn't this going to just further elongate this process? The process has been long and we wish that there was something we could do about that. But the bottom line is that there's not adequate protection right now. So we'd be worse off being stuck with a plan that doesn't protect the resource than hoping that in three, two and a half years from now, we'll have a plan that is actually protective. And to the extent this court can strongly direct the Park Service to have numeric limits and to consider types and use together in an integrated plan and to look at facilities and services together, all of this collectively so that they can have a real protective plan for the Merced River Corridor. That's what we would hope. Are the interim limits that were adopted by the Park Service still in effect? The interim facilities limits? Yes. They were interim while they studied what's going on. Are those still in effect? Well, the plan has been set aside and so the limits themselves aren't in effect, but we do have an injunction against the Park Service currently that prevents them from expanding facilities. They're able to... They stopped expanding facilities, but are there still in force some interim limits on, say, trailhead  in this area? Do they limit the number of people that can use the trails? Yes. All of the limits that preexisted, so the Wilderness Trailhead Quota System, the Superintendent's Compendium that deals with group size in wilderness, all of those are still in place. Are they working? Are they effective? I think that the Wilderness Trailhead Quota System, for the most part, does a good job of protecting the resource, but again, they haven't looked at it in terms of is it protecting the river values specifically? They haven't gone that far, but in terms of the Wilderness Act, the Wilderness Trailhead Quota System is, for the most part, doing a good job. There are some issues we don't need to go into here, but yes, so those are all still in place and we do have an injunction in place that prevents expansion of development currently, but there never have been any maximum limits in the river corridor in this plan or any other plan. Well, the river corridor isn't just a unitary thing. It has a variety of sites and so on. Now, are those varieties recognized? What is it, about 60% of the river is in the wilderness area? That's correct. The rest of it, the damage is already done. Well, but that's interesting. The Wild and Scenic Rivers Act requires enhancement of river values so the Park Service has an obligation to look at how do we deal with past degradation, how do we deal with ongoing degradation, and if I may, the no action alternative in the EIS says there is ongoing degradation, and what council has claimed is that somehow, because of VERPS 10 indicators and it doesn't hold water, the analysis does not hold water, because the status quo exists in both of those alternatives. The only difference are the 10 standards and indicators. So, as I understand the injunction, all new projects except for two are enjoined. Is that correct? I believe that's correct. They're able to proceed with some road work and the continuing sewer work. Does anyone have any other questions? Thank you, Council. Thank you, Your Honors. A couple of quick points. The Park Service does have scientists and other experts in user capacity, and they have determined that setting a maximum number of people who can come into the park would not be protective, because it doesn't address what the people are doing when they're in the park, and that it's more effective to focus on what people are doing and try through education, and when that doesn't work, through more restrictive means, to prevent any damage by people, rather than setting an overall quota, and I think the Park Service is entitled to make that judgment. Now, quotas can work in certain circumstances. It's been pointed out that there are quotas in the wilderness for overnight camping, but that's a situation where you have kind of limited access, and it's possible to do a reservation system for trails, but in the valley, where you have a highway with scenic views and so forth, it would be extraordinarily difficult to have a quota system or a reservation for that sort of resource. Have you ever personally driven on Highway 81 through the valley in the summer? Yes. Or tried to? Well, it gets crowded. It's extremely crowded. When I try to put some concrete I've spent a lot of time up there, so when I try to put some concrete notion as to what they're talking about and what you're talking about, it gets sometimes to the point where you can't even move your car. So why wouldn't a cap on the number of cars be a good idea? Well, in fact, the interim limit on parking spaces really acts as a proxy. Because parking spaces, that's not driving along the highway and then people pulling off on the road and all of that. Well, but when the parking lot fills up, they are now diverting people so that they'll go up to Tuolumne or to Glacier Point rather than into the valley, and that is helping keeping it from being as crowded. So they certainly are working on that situation. And, you know, the other interim limits, like on lodge units and so forth, also are proxies for numbers of people. I want to stress that the interim limits, I mean the Park Service is observing those and they are in force, and they may well last longer than five years. I mean, what the plan says is they're only interim in the sense that once we are... That's another problem, isn't it? That this plan isn't really a concrete plan in that you could change it at any time, and you might switch after five years, you won't commit to what the real thing is going to be at whatever point. Well, the Park Service is absolutely committed to using VRP. The aspect of VRP, though, is it's an adaptive management plan, so the indicators can change over time, because as data comes in, the Park Service is finding out that some of the indicators can be improved, that maybe they need to add others, maybe some aren't giving you any good data, so those can be dropped. So it does adjust to the information that's coming in. It's not rigid, but the Park Service is absolutely committed to VRP. It's gotten the funding for it, it has staff, and so the notion that it's somehow just an interim solution, I think, was based on the District Court's confusion between VRP and the interim standards. So this is what the Park Service is going to be doing for the foreseeable future. In conclusion, I would just stress that this Court noted in its original opinion that the statutory mandate is to address user capacities, and that Congress did not further define address, and that that indicates that the Park Service does have a wide amount of discretion in how it comes up with a plan to address user capacities. There can certainly be debate about whether quotas are better in some situations than others, but at the end of the day, it's the Park Service that gets to make the call of how to address user capacities, and I think this plan and the EIS show that it's done that in a reasonable way here. Unless there are questions, I'm out of time. Thank you very much. Thank you very much, Counsel. This case will be taken under submission, and this Court is adjourned for the day.
judges: Goodwin, Tashima, Wardlaw